# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of: )
)
)
The cellular telephone assigned call number 414-324-3456 ) Case No. 15-M-404
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Codes, Sections 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached affidavit.

S/A *(signature)*
*Applicant's signature*

Raymond L. Taylor, Task Force Agent
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: February 12, 2015
at 3:25 PM

*(signature)*
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable William E. Callahan, Jr., U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Raymond L. Taylor, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 414-418-6400, with International Mobile Subscriber Identity 310410696793011 ("**Target Phone #1**"), whose service provider is AT&T Mobility, a wireless telephone service provider headquartered in West Palm Beach, Florida and the location of the cellular telephone assigned call number 414-324-3456, with International Mobile Subscriber Identity 310150805705922 ("**Target Phone #2**"), whose service provider is T-Mobile, a wireless telephone service provider headquartered in Parsippany, New Jersey. **Target Phone #1** and **Target Phone #2** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the Wisconsin Department of Justice, and have been since February 12, 2001. On December 3, 2014, I was deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI).

3. As a Federal Task Force Officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics

investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this

2

investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 have been committed, are being committed, and will be committed by Brian Kielman, Tyrice Akins, and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations of 21 U.S.C. §§ 841(a)(1) and 846, and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

6. Since October of 2013, special agents from the Wausau office of the Wisconsin Department of Justice, Division of Criminal Investigation, have been conducting a joint investigation with members of the Marshfield Police Department and Wisconsin Rapids Police Department, regarding the trafficking of large quantities of heroin in the central Wisconsin area. Case agents identified the primary target in the investigation in central Wisconsin as Alonzo Jackson, (b/m, dob: 8/22/1980) of 952 Chase Street, Wisconsin Rapids, WI. During the course of the investigation, case agents were able to determine that Jackson was distributing large quantities of heroin in central Wisconsin and was travelling to the north side of Milwaukee to obtain large

quantities of heroin and transporting the heroin back to central Wisconsin for distribution. Based upon their training and experience and the investigation, case agents suspected that Jackson was purchasing approximately 50-100 grams of heroin at a time in Milwaukee and then transporting it back to central Wisconsin for distribution.

7. On January 8, 2015, case agents conducted a traffic stop of Jackson in front of Jackson's residence, 952 Chase Street, Wisconsin Rapids, WI. During the course of the traffic stop, agents and officers seized approximately 59.16 grams of heroin from the vehicle Jackson was operating. Subsequent to the seizure from Jackson's vehicle, law enforcement agents obtained a search warrant for Jackson's residence, 952 Chase Street, Wisconsin Rapids, Wisconsin and seized an additional 19.33 grams of heroin.

8. Jackson was arrested and after being advised of his *Miranda* warnings and waiving them, Jackson agreed to provide a statement and cooperate with law enforcement. Jackson stated that he had been selling heroin in the central Wisconsin area since his release from prison in June of 2013. Jackson admitted that he had been travelling to Milwaukee to pick up heroin for approximately the past year. Jackson stated that he would come to Milwaukee and meet with a subject named Brian L. Kielman (w/m, dob: 3/16/1977) residing at 7779 North Edgeworth, Milwaukee, WI. Jackson stated that Kielman is the "ultimate middle man." Jackson stated that Kielman has connections to multiple sources who sell large quantities of heroin.

9. Jackson stated that he typically purchased 100 grams of heroin during each trip to Milwaukee, and he paid Kielman a few hundred dollars each trip for his

4

assistance in arranging the heroin transaction. Jackson stated over the last fifteen (15) months he had purchased heroin from Kielman approximately fifty (50) times and that each time he purchased heroin from him he purchased approximately fifty (50) to one hundred (100) grams. Jackson stated that he would either buy directly from Kielman or Kielman would act as the "middle man" and arrange the purchase of heroin from another seller. Jackson stated that the largest amount of heroin that he had purchased at one time from Kielman was 100 grams. Jackson stated that he spoke with Kielman on **Target Cell Phone #1** to arrange his most recent heroin purchase.

10. Jackson stated that the heroin that the police recovered from him during his arrest was purchased from a subject named "P." Jackson was shown a picture of Tyrice E. Akins (b/m dob: 09/29/1986) without any identifying information and positively identified Akins as the individual he knew as "P" and from whom he had purchased heroin. Jackson stated that Akins has been trying to get Jackson to purchase 200 grams of heroin from him the last couple times they met. Jackson stated that he has purchased heroin from Akins on twelve (12) to fifteen (15) occasions and he met Akins through Kielman. Jackson stated that Akins would give him heroin on consignment and he currently owes Jackson $6,000 from previous heroin purchases.

11. In late January of 2015 agents developed a Confidential Source (CS #1) who stated that s/he had previously trafficked heroin with Jackson and in that capacity had purchased heroin from Kielman on numerous occasions on Jackson's behalf. CS #1 stated that Kielman told him/her that he (Kielman) had numerous sources for the

5

purchase of large quantities of heroin. CS #1 stated that the purchases of heroin typically occurred at Kielman's residence, 7779 North Edgeworth, Milwaukee, WI. Between January of 2015 and February of 2015, CS #1 was interviewed and provided detailed information about the current and past drug-trafficking activities of Kielman and his associates. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since January of 2015. Second, the information CS #1 has provided is substantially against CS #1's penal interest. Third, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including surveillance and information from other sources. For example, CS #1 informed case agents that Kielman used **Target Phone #1** to contact Jackson, which call detail records confirm. Finally, CS #1 has had an adequate opportunity to directly observe the events discussed and has heard conversations directly from the individuals discussed. CS #1 has a 2006 misdemeanor conviction for domestic abuse. CS #1 is cooperating for consideration regarding potential distribution of heroin charges CS #1 will be facing based upon his/her involvement in this heroin trafficking organization and is cooperating for consideration on behalf of Jackson, who is currently incarcerated. For these reasons, I consider CS #1 to be reliable.

12. Based upon my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The

6

operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

13. On January 27 and 28, 2015, acting under the direction and control of law enforcement, CS #1 placed recorded phone calls to Kielman on **Target Phone #1**. During the course of the calls Kielman agreed to sell CS #1 approximately 30 grams of heroin. Kielman directed CS #1 to meet him at his residence on January 28, 2015 for the heroin transaction. On January 28, 2015, acting under the direction and supervision of law enforcement, CS #1 travelled to Kielman's residence at 7779 North Edgeworth Drive, Milwaukee, WI to conduct the heroin transaction. Upon arrival at Kielman's residence, Kielman placed a call to an unknown subject named "Steve." Kielman told CS #1 that "Steve" was a heroin source that he utilized. "Steve" along with two additional black males then met with CS #1 and Kielman at Kielman's residence, 7779 North Edgeworth Drive, Milwaukee, Wisconsin, and delivered approximately 31.8 grams of heroin to CS #1. Based upon their training and experience and the

7

investigation to date, case agents believe Kielman contacted "Steve," one of his heroin sources, on **Target Phone #1**.

14. CS #1 also stated that s/he is familiar with a subject named "P" (believed to be Tyrice Akins). CS #1 stated that s/he was introduced to Akins by Kielman. CS #1 indicated that Akins is a source of heroin for Kielman. The CI stated that Akins has offered his customers up to 200 grams of heroin. The CI stated that Akins sometimes gives his customers heroin on consignment. The CI stated Akins utilizes phone number 414-324-3456 (target phone) to arrange for heroin transactions.

15. On January 28 2015, acting under the direction and control of law enforcement CS #1 placed a recorded call to Akins on **Target Phone #2** to arrange for the purchase of 40 grams of heroin. During the conversation, Akins stated that he would sell CS #1 40 grams of heroin and they agreed to meet to conduct the transaction at Andy's Gas Station at 7605 West Good Hope Road, Milwaukee, WI. On January 28, 2015, acting under the direction and supervision of law enforcement, CS #1 travelled to 7605 West Good Hope to meet with Akins. After a brief period of time surveillance units observed Akins arrive in the parking lot of Andy's Gas Station in a gray colored Chevy Impala. Akins then called CS #1 using **Target Phone #2** and informed CS #1 that he had to wait for his girlfriend to arrive to complete the transaction. Akins subsequently parked and waited in his vehicle in the parking lot for his girlfriend to arrive. After a period of time case agents observed Akins meet with a black female in a newer model white Camry. After meeting with the female in the Camry, Akins then

8

met with CS #1, who was located in his/her vehicle in the parking lot, and Akins delivered 40.1 grams of heroin to CS #1. After the transaction CS #1 turned over the heroin to law enforcement.

16. A subpoena to AT&T Mobility for telephone number 414-418-6400 (**Target Phone #1**) revealed that the subscriber is Catherine Kielman (believed to be Brian Kielman's mother) at 7779 N. Edgeworth Drive, Milwaukee, Wisconsin, 53223. A subpoena to T-Mobile for telephone number 414-324-3456 (**Target Phone #2**) revealed that the subscriber is P Bell at 1230 E Singer Circle, Glendale, WI, 53212. Based upon their training and experience and the investigation to date, case agents believe "P Bell" is a nominee. Based upon my training and experience, it is common for narcotics traffickers to utilize cellular telephones that are either anonymous or under fictitious names or addresses in order to hide their identities and activities from law enforcement.

17. Based on the information above, I submit that probable cause exists to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, conspiracy to possess with intent to distribute and distribution of heroin, Schedule I controlled substances, have been committed, are being committed, and will continue to be committed by Brian Kielman, Tyrice Akins and others. I further submit that probable cause exists to believe that obtaining the location information of (414) 418-6400 (**Target Phone #1**) and 414-324-3456 (**Target Phone #2**) will assist case agents in determining Brian Kielman and Tyrice Akins' other customers, co-conspirators, sources of supply, and help to identify stash houses.

9

18. In my training and experience, I have learned that AT&T Mobility is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

19. Based on my training and experience, I know that AT&T Mobility can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on AT&T Mobility's network or with such other reference points as may be reasonably available.

10

20. Based on my training and experience, I know that AT&T Mobility can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

21. Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

22. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of **Target Phone #1** and **Target Phone #2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

11

23. I further request that the Court direct AT&T Mobility and T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T Mobility or T-Mobile for a time period of 45 days from the date the warrant is signed. I also request that the Court direct AT&T Mobility and T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T Mobility and T-Mobile services, including by initiating a signal to determine the location of **Target Phone #1** on AT&T Mobility's network and **Target Phone #2** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T Mobility and T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

24. I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate **Target Phone #1** and **Target Phone #2** outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (414) 324-3456, with International Mobile Subscriber Identity 310150805705922 ("**Target Phone #2**"), whose wireless service provider is T-Mobile, a company headquartered at Parsippany, New Jersey.

2. Information about the location of the **Target Phone #2** that is within the possession, custody, or control of T-Mobile.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the Target Phone #2 described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Phone #2" include all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Phone #2** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).